# United States Court of Appeals for the Federal Circuit

---

**M.Z. BERGER & CO., INC.,**
*Appellant*

v.

**SWATCH AG
(SWATCH SA) (SWATCH LTD.),**
*Appellee*

---

2014-1219

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. 77/222,620.

---

Decided: June 4, 2015

---

ROBERT THOMAS SMITH, Katten Muchin Rosenman LLP, Washington, DC, argued for appellant. Also represented by HOWARD ROBERT RUBIN, DANIEL LIPTON; SAMSON HELFGOTT, JESSICA MEGAN GARRETT, New York, NY.

JEFFREY A. LINDENBAUM, Collen IP, Ossining, NY, argued for appellee. Also represented by JESS M. COLLEN.

---

Before LOURIE, CHEN, and HUGHES, *Circuit Judges*.

CHEN, *Circuit Judge.*

M.Z. Berger & Co., Inc. (Berger) appeals from the Trademark Trial and Appeal Board (Board) decision to sustain an opposition on grounds that Berger, at the time of its application for the mark "iWatch," lacked a bona fide intent to use the mark in commerce under Section 1(b)(1) of the Lanham Act, 15 U.S.C. § 1051(b)(1). *See Swatch AG v. M.Z. Berger & Co.*, 108 U.S.P.Q.2d (BNA) 1463 (T.T.A.B. 2013) (*Opinion*). The Board concluded that Berger merely intended to reserve a right in the mark and thus lacked the requisite intent. Because substantial evidence supports the Board's determination, we affirm.

## I. BACKGROUND

Berger is a business that manufactures, imports, and sells watches, clocks, and personal care products. On July 5, 2007, it filed an intent-to-use application at the Patent and Trademark Office (PTO), seeking to register the mark "iWatch" for over thirty different goods, each of which belongs to one of three general categories: watches, clocks, and goods related to watches and/or clocks (e.g., clock dials, watch bands, and watch straps).[1]

The application included a declaration which states that Berger has "a bona fide intention to use or use through [Berger's] related company or licensee the mark in commerce on or in connection with the identified goods and/or services." Joint Appendix (J.A.) 1022.

---

[1] Berger applied for the mark in standard characters and thus would have had no claim to any particular style or lettering of the mark. 37 C.F.R. § 2.52(a). We nonetheless refer to the mark in its mixed-case form (iWatch) for ease of reference and because that is how Berger presented the mark in its application.

The PTO approved the application for publication on May 21, 2008. On October 22, 2008, Swatch AG (Swatch) filed a Notice of Opposition on the basis that "iWatch" is confusingly similar to its mark, "Swatch." Swatch later added a claim opposing the mark on ground that Berger lacked a bona fide intent to use the mark in commerce at the time Berger filed the application.

The Board assessed whether Berger had the requisite intent to use the iWatch mark by separately considering each of the three general categories of goods. *Opinion* at 1475. With respect to Berger's intent to use the iWatch mark on two of the categories, clocks and goods related to watches/clocks, the Board considered the testimony of Berger's owner and CEO, Bernard Mermelstein. *Id.* Mr. Mermelstein not only created the iWatch mark and instructed that the trademark application be filed, but he was Berger's sole witness designated under Federal Rule of Civil Procedure 30(b)(6). *Id.* The Board thus treated Mr. Mermelstein's testimony as representing the views of the company at the time the application was filed. *Id.*

Although the trademark application recited watches, clocks, and goods related to clocks and watches as the goods Berger intended to sell with the proposed mark, Mr. Mermelstein testified that Berger never intended for the mark to be used for any goods other than watches:

Q. Are there other products other than watches that you anticipate for use with the iWatch mark?

A. No.

J.A. 847. Mr. Mermelstein further testified:

Q. At the time you filed the application you didn't expect the iWatch mark to be used for clocks and personal care products?

A. No. Correct.

J.A. 848.

Berger's paralegal who filed the application, Monica Titera, testified that Mr. Mermelstein instructed her to register the mark only for watches and clocks. J.A. 979. When asked why the other related goods were identified in the application, Ms. Titera claimed that the list was "standard" and used to "leave all doors open." J.A. 985. Based on Mr. Mermelstein's and Ms. Titera's testimonies, the Board concluded that Berger lacked a genuine intent to use the mark on clocks and related goods. *Opinion* at 1475.

With respect to the third category of goods, watches, the Board also concluded that Berger lacked a genuine plan to commercialize the iWatch mark on such goods. The Board considered the documentary evidence of record but found that such evidence did not demonstrate intent because the documents related solely to prosecution of the trademark application. As for the testimonial evidence presented by Berger, the Board found that Berger's employees failed to tell a consistent story about the company's intent at the time the application was filed. The Board lastly considered the company's long history in the watch business, but found that Berger's inaction with respect to a potential iWatch product diminished the value of such evidence.

The only documents relating to the potential use of the mark consisted of: (i) a trademark search performed by the paralegal; (ii) an internal email describing the substance of a discussion between the paralegal with the trademark examining attorney concerning the application; and (iii) a series of internal emails forwarding images of watches and a clock bearing the iWatch mark. *Id*. at 1472–73.

The Board agreed with Swatch that the documentary evidence only related to the trademark application and thus did not evidence a genuine intent to commercialize certain watches using the iWatch mark. It found that the

trademark search was performed only a few days prior to the filing of the application.[2]  The Board found that the forwarded images were also prosecution-driven because they appeared to have been created and submitted to the PTO in response to the examining attorney's request for additional information on how Berger planned to use the mark.  *Id*. at 1472, 1473–74 (noting that the images were created shortly before they were submitted to the PTO in response to the request).

Moreover, the Board found there was conflicting testimony among Berger employees regarding what the images actually depicted.  Some employees testified that the images were pictures of actual mockup watches and clocks.  *Id*. at 1473.  On the other hand, Mr. Mermelstein testified that no such mockups were ever made and that the images were generated for purposes of advancing the trademark application.  J.A. 867–68.  And although Berger employees claimed that creating physical models and renderings was a normal part of its product development process, Berger did not present any physical or documentary evidence relating to the iWatch mark beyond the images submitted to the PTO.  *Opinion* at 1474.

Based on Mr. Mermelstein's admissions and the timing of the creation of the documents, the Board concluded that the documentary evidence did not establish that Berger had a bona fide intent to use the mark in commerce.  *Id*. at 1474–75.

The Board then considered the remaining evidence, which consisted of Berger employee testimony, and likewise found that it failed to establish that Berger genuinely intended to use the mark in commerce.  For example,

---

[2]    From our review of the record, it appears that the trademark search was actually performed on July 5, 2007, the same date the application was filed.

Berger's vice president of merchandising, Brenda Russo, generally recalled having discussed the iWatch mark for a few minutes with a buyer during a discussion in a Berger showroom. *See id.* at 1476. But this testimony conflicts with that of Mr. Mermelstein, who denied that Berger had discussions regarding the iWatch mark with anyone outside the company. J.A. 849 ("Q. Has the iWatch mark been discussed outside of your office except with respect to the counsel in this proceeding? A. No.").

Ms. Russo's testimony also appears to contradict representations Berger made to the PTO during prosecution of the trademark application. In particular, the examiner rejected the mark as descriptive because the "i" in iWatch could be interpreted as a well-established reference to "interactive." J.A. 50. In response to that rejection, Berger alleged:

> The "i" does not refer to any particular feature of the watches or clocks. The "i" is purely arbitrary. The images we previously submitted were just mock-ups to show a buyer. However, the buyer decided that models which previously had interactive features were too expensive. Thus, there will be no interactive features on any models.

J.A. 75. Ms. Russo, who was the only Berger witness who claimed to have met with a buyer, testified to the contrary. She recalled mentioning to the buyer that the watch would have certain technological features, and when asked at her deposition whether that buyer expressed concern about the cost of the iWatch watch, she answered "no." *See Opinion* at 1476. Because the evidence relating to Ms. Russo's discussion with the buyer conflicted with Berger's statement during prosecution, the Board chose not to credit the alleged meeting as demonstrating bona fide intent. *Id.*

The Board considered that some of Berger's employees testified to having attended internal brainstorming ses-

sions and merchandising meetings about the iWatch mark, none of which were documented in the record. But there was testimony from Mr. Mermelstein that suggested any alleged meetings would not have been particularly meaningful. For example, he testified that, as of 2010, three years after the application was filed, Berger had yet to figure out what type of watch it intended to sell with the iWatch mark, or even whether such a watch would have any particular features. J.A. 846. Mr. Mermelstein also stated that, at the time of the filing, Berger had little more than an aspiration to reserve rights in the mark in case it later decided to develop an associated watch:

> Q. Okay. And how did you come up with that mark?
>
> A. I think that I came up with the mark because of the advent of technology and information gathering around the globe over the last I guess few years, I thought that *if we decided* to do a — either a technology watch or information watch or something that would have that type of characteristics that would be a good mark for it.

J.A. 845 (emphasis added).

Finally, the Board considered the fact that Berger had been in the business of making and selling watches and clocks for many years. It determined, however, that Berger's history of making and selling watches was not particularly relevant to the instant dispute because Berger employees testified they had not previously made a watch with technological features, and admitted they never took any step toward developing any such features, either contemporaneous with the filing of the application or in the eighteen months thereafter. *Opinion* at 1476. Though Berger represented to the PTO that the mark was not restricted to "interactive" watches, the Board found Berger's inaction was significant in light of its contention that the idea was to use the mark with a "smart" watch.

*Id.* at 1476–77. Berger argued that its intent to use the iWatch mark was corroborated by its use of a subsequent mark, i-Kidz and its efforts to develop the mark iMove for watches. The Board found this evidence unpersuasive, as these efforts were related to different marks and had occurred almost three years after the iWatch application was filed. *Id.* at 1477 (noting intent must be considered at the time the application was filed).

The Board ultimately concluded that some of Berger's evidence, reviewed in isolation, may have been sufficient to establish intent. However, the circumstances as a whole—including the lack of documentary evidence and the conflicting testimony of Berger witnesses—demonstrated that Berger lacked a bona fide intent to use the mark in commerce as required, and sustained the opposition under Section 1(b) of the Lanham Act. *Id.* Berger appealed the Board's decision to sustain the opposition on this ground.[3] We have jurisdiction under 28 U.S.C. § 1295(a)(4)(B).

## II. DISCUSSION

### A

We review the Board's legal conclusions without deference and its factual findings for substantial evidence. *In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003). "Substantial evidence is 'more than a mere scintilla' and 'such relevant evidence as a reasonable mind would accept as adequate' to support a conclusion." *Id.* (quoting *Consol. Edison v. NLRB*, 305 U.S. 197, 229 (1938)).

---

[3] The Board separately found that there was no likelihood of confusion between the Swatch and iWatch marks. Swatch challenges that finding in its briefing. Because we affirm on the basis of lack of bona fide intent, we do not address that aspect of the Board's decision.

B

The Trademark Law Revision Act of 1988 (TLRA) contemplated the very scenario presented by this case. The TLRA changed the Lanham Act by permitting applicants to begin the registration process before actual use of the mark in commerce at the time of filing, so long as the applicant had a *"bona fide intention . . .* to use [the] mark in commerce" at a later date. 15 U.S.C. § 1051(b)(1) (emphasis added).

The prior version of the Lanham Act required that a trademark applicant already be using the mark in commerce at the time of the application's filing to qualify for trademark registration. *See Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1357 (Fed. Cir. 2009). This requirement, however, led to the practice of some applicants engineering a "token use," which refers to the most minimal use of a trademark, designed purely to secure rights in that mark before an applicant is truly prepared to commercialize a good or service in connection with a given mark. In the legislative record of the TLRA, Congress noted that token use was problematic for a number of reasons, including that such uses were not uniformly available across industries. S. REP. NO. 100-515 ("Senate Report"), at 6 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5577, 5582. For example, token use for large or expensive products, such as airplanes, or for service industries was "virtually impossible." *Id.* Another problem was that the rules allowed registration based on minimal use, which led to an undesirable surplus of registered but virtually unused marks. *Id.* On the other hand, Congress also recognized that the use requirement placed "significant legal risks on the introduction of new products and services" and disadvantaged certain industries and smaller companies in the marketplace. *Id.* at 5. An applicant already using a mark in commerce risks, for example, potential infringement of a competitor's pre-existing mark

prior to being able to begin the process of securing its own rights.

Congress sought to address these problems in passing the TLRA.  *Id.*  To address the problem of "token use," the TLRA heightened the burden for use applications by requiring that an applicant's use be *bona fide use* of [the] mark in the ordinary course of trade."  Trademark Law Revision Act of 1988, Pub. L. No. 100-667, 102 Stat. 3935 (effective November 16, 1989) (codified at 15 U.S.C. § 1127) (emphasis added).  Concurrently, the TLRA lowered the bar to starting registration by allowing applicants to proceed on the basis that they have a "bona fide intention to use the mark in commerce" at a later date.  15 U.S.C. § 1051(b)(1); *see* H.R. REP. NO. 100-1028 ("House Report"), at 8–9 (1988) ("By permitting applicants to seek protection of their marks through an 'intent to use' system, there should be no need for 'token use' of a mark simply to provide a basis for an application.  The use of the term 'bona fide' is meant to eliminate such 'token use' and to require, based on an objective view of the circumstances, a good faith intention to eventually use the mark in a real and legitimate commercial sense."); J. Thomas McCarthy, 3 *McCarthy on Trademarks and Unfair Competition* § 19.14, at 19.47–48 (4th ed. 2014) (*McCarthy on Trademarks*).

While applicants can begin the registration process having only a sincere intent, the TLRA also requires that applicants filing such intent-to-use applications must in due course either (i) file a verified statement of actual use of the mark, or (ii) convert the application into a use application.  15 U.S.C. §§ 1051(b)(3), (c), (d).  In other words, such applicants are eventually required to show that the mark is being used in commerce before obtaining a registration on the mark.

C

Because this court has not previously done so, we first address the issue of whether lack of a bona fide intent is proper statutory grounds on which to challenge a trademark application. The PTO has long held that lack of such intent is a proper basis on which an opposer can challenge an applicant's registration.[4] We agree. An opposer is "entitled to rely on any statutory ground which negates appellant's right to the subject registration[.]" *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 1031 (C.C.P.A. 1982) (citing *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). Because a bona fide intent to use the mark in commerce is a statutory requirement of a valid intent-to-use trademark application under Section 1(b), the lack of such intent is a basis on which an opposer may challenge an applicant's mark. We note that the one other circuit court to address this issue has likewise so held. *Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 21 (D.C. Cir. 2008).

D

We turn now to the question of what "bona fide intention" means under Section 1(b) of the Lanham Act. In its entirety, Section 1(b)(1) specifies that:

---

[4]    *See, e.g.*, *L'Oreal S.A. v. Marcon*, 102 U.S.P.Q.2d (BNA) 1434, 1442–43 (T.T.A.B. 2012); *Lane Ltd. v. Jackson Int'l Trading Co.*, 33 U.S.P.Q.2d (BNA) 1351, 1355–56 (T.T.A.B. 1994); *Commodore Elecs. Ltd. v. CBM Kabushiki Kaisha*, 26 U.S.P.Q.2d (BNA) 1503, 1506–07 (T.T.A.B. 1993); *see also* 3 *McCarthy on Trademarks* § 20:21, at 20-74–75; Trademark Board Manual of Procedure (TBMP) § 309.03(c), note 18 (3rd ed. 2011) (collecting cases).

A person who has a bona fide intention, under circumstances showing the good faith of such person, to use a trademark in commerce may request registration of its trademark on the principal register hereby established by paying the prescribed fee and filing in the Patent and Trademark Office an application and a verified statement, in such form as may be prescribed by the Director.

15 U.S.C. § 1051(b)(1).

There is no statutory definition of the term "bona fide," but the language is clear on its face that an applicant's intent must be "under circumstances showing the good faith of such person." *Id.* The reference to "circumstances showing the good faith" strongly suggests that the applicant's intent must be demonstrable and more than a mere subjective belief. Both the PTO and the leading treatise on trademark law have arrived at this same understanding. *See Lane*, 33 U.S.P.Q.2d at 1355; 3 *McCarthy on Trademarks* § 19.14, at 19.48 ("Congress did not intend the issue to be resolved simply by an officer of the applicant later testifying, 'Yes, indeed, at the time we filed that application, I did truly intend to use the mark at some time in the future.'").

This interpretation is confirmed by the legislative history, where Congress made clear that whether an applicant's intent is "bona fide" should be assessed on an objective basis:

Although "bona fide" is an accepted legal term, it can be read broadly or narrowly, subjectively or objectively, by a court or the Patent and Trademark Office. In connection with this bill, *"bona fide" should be read to mean a fair, objective determination of the applicant's intent* based on all the circumstances.

Senate Report at 24 (emphasis added); *see also id.* at 23 ("Bona fide intent is measured by objective factors."); House Report at 8–9 ("The use of the term 'bona fide' is meant to . . . require, based on an objective view of the circumstances, a good faith intention to eventually use the mark in a real and legitimate commercial sense."). In addition, an applicant's intent must reflect an intention to use the mark consistent with the Lanham Act's definition of "use in commerce":

> [T]he bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark.

15 U.S.C. § 1127; *see also* Senate Report at 24–25 (quoting the definition). The applicant's intention to use the mark in commerce must have been "firm." Senate Report at 24.

Neither the statute nor the legislative history indicates the specific quantum or type of objective evidence required to meet the bar. Indeed, Congress expressly rejected inclusion of a statutory definition for "bona fide" in order to preserve "the flexibility which is vital to the proper operation of the trademark registration system." *Id.*[5]

---

[5] The PTO has promulgated a rule specifying that an applicant's ongoing efforts to make use of a mark "may include product or service research or development, market research, manufacturing activities, promotional activities, steps to acquire distributors, steps to obtain governmental approval, or other similar activities." 37 C.F.R. § 2.89(d). Although this rule relates to the required showing of "good cause" for an extension to file a statement of use, i.e., at a time after the initial filing, such evidence may also indicate sources of objective

Accordingly, we hold that whether an applicant had a "bona fide intent" to use the mark in commerce at the time of the application requires objective evidence of intent. 15 U.S.C. § 1051(b)(1). Although the evidentiary bar is not high, the circumstances must indicate that the applicant's intent to use the mark was firm and not merely intent to reserve a right in the mark. *See id.* § 1127; *see also* Senate Report at 24–25. The Board may make such determinations on a case-by-case basis considering the totality of the circumstances.

### III. M.Z. BERGER'S APPEAL

#### A

Berger argues that it satisfied the minimal standard for intent, and that the Board improperly discounted Berger's evidence. Berger's arguments hinge on its belief that the Board should have found the intent requirement satisfied because Berger offered *some* objective evidence in support of its position. Viewed in isolation, the evidence Berger prefers to focus on could perhaps lead a reasonable fact-finder to conclude there was bona fide intent. As discussed above, however, all circumstances regarding an applicant's bona fide intent must be considered, including those facts that would tend to disprove that Berger had the requisite intent. 15 U.S.C. § 1051(b)(1); *see also Lane*, 33 U.S.P.Q.2d at 1353 ("[W]hether an applicant has a bona fide intention . . . must be an objective determination based on *all* the circumstances." (emphasis added)).

Here, viewing the evidence as a whole, we find that substantial evidence supports the Board's conclusion. First, we agree with the Board that the documentary

---

evidence of an applicant's bona fide intent to use the mark in commerce.

evidence offered by Berger appears to relate only to the prosecution of the trademark application. *See Opinion* at 1474–75 (citing *Research In Motion Ltd. v. NBOR Corp.*, 92 U.S.P.Q.2d (BNA) 1926, 1931 (T.T.A.B. 2009) ("If the filing and prosecution of a trademark application constituted a bona fide intent to use a mark, then in effect, lack of a bona fide intent to use would never be a ground for opposition or cancellation, since an *inter partes* proceeding can only be brought if the defendant has filed an application.")). The paralegal who performed the trademark search testified that such searches are routinely conducted before Berger files a trademark so that Berger does not waste time filing an application on an unavailable mark. It is undisputed that the internal email relaying the substance of a discussion with the trademark examining attorney also relates to the application. The other internal emails, which forwarded the images of two watches and a clock bearing the mark, were undisputedly submitted to the PTO in response to the trademark examining attorney's request for documents showing how the mark would be used. *Opinion* at 1473–74.

Faced with conflicting statements from Berger witnesses about whether the images were created for prosecution or for business reasons evidencing intent, the Board exercised its discretion in crediting the testimony of Mr. Mermelstein, Berger's Rule 30(b)(6) witness, over that of other Berger employees. *Id.* at 1474 (relying on Mr. Mermelstein's admissions that the images were created for the trademark application). We defer to the Board's determination of the weight and credibility of such evidence. *See, e.g.*, *Velander v. Garner*, 348 F.3d 1359, 1371 (Fed. Cir. 2003) (stating, in a PTO interference proceeding, that it is "within the discretion of the trier of fact to give each item of evidence such weight as it feels appropriate"). Having found that the documentary evidence was generated in relation to the trademark application,

the Board reasonably determined that such images were likely created with an intention to advance the prosecution of the trademark application rather than an intention to move forward on an actual product in commerce. *See Opinion* at 1474–75.

Berger has offered no reason to disturb the Board's findings based on the remaining testimonial evidence. The Board properly exercised its judgment in finding that Berger lacked a bona fide intent to use the mark on any of the goods identified in the application. Mr. Mermelstein admitted that there was no intent to use the iWatch mark for clocks, and Ms. Titera conceded that the other accessories and related goods were only designated to leave Berger's options open. *Id.* at 1475.

With respect to watches, the Board considered conflicting testimony about Berger's alleged meeting with a buyer, as well as whether the watch would be technological in nature. The Board was within its discretion to disagree with Berger's bottom-line position that it possessed a bona fide intent, given the inability of the Berger witnesses to pull together a consistent story on a number of issues, e.g., would the watch be technological, did actual physical samples exist, were potential customers ever consulted. Critically, Mr. Mermelstein all but conceded that Berger had not yet made a firm decision to use the mark in commerce at the time of its application. J.A. 845 ("[I]f [Berger] decided to do a — either a technology watch or information watch or something that would have that type of characteristics that [iWatch] would be a good mark for it."). *See, e.g.*, *Research in Motion*, 92 U.S.P.Q.2d at 1931 (applicant's stated belief that the mark would be "a good mark for future use" does not establish a bona fide intent to use).

We also find unavailing Berger's contention that the Board ignored Berger's history in the watch industry.

The Board did consider Berger's past but noted that even though the iWatch mark was allegedly to be used with a "smart" watch, Berger had never made such a watch and took no steps following the application to develop such a watch. *Opinion* at 1476–77. We find no error with the Board's determination that there was no nexus between Berger's general capacity to produce watches and the capacity required to produce a "smart" watch.

Ultimately, we find that the Board properly exercised its judgment as the trier of fact in assessing the evidence and concluding that Berger did not have a bona fide intent to use the mark at the time of its application. Berger's contention that the Board "missed the forest for the trees" by systematically discrediting each piece of evidence is misplaced. Quite to the contrary, the Board's opinion reflects that it carefully considered Berger's evidence and understandably found that Berger lacked "bona fide" intent to use the iWatch mark on the recited goods at the time of the application was filed. *E.g., id.* at 1474, 1476.

The bar for showing a bona fide intent is not high. But in our view, considering the inconsistent testimony offered by Berger employees and the general lack of documentary support, substantial evidence supports the Board's conclusion that Berger's intent at the time of the application was merely to reserve a right in the mark, and not a bona fide intent to use the mark in commerce. *Id.* at 1477.

B

Berger also argues that the Board applied the wrong legal standard for bona fide intent, "because it insisted upon evidence that [Berger] had taken steps to promote, develop and market the iWatch mark at the time that it filed its original application." Appellant's Br. at 32; *see also id.* at 18, 19, 22, 23, 34, 37, 41, 42. Berger argues

that the Board's emphasis on objective evidence conflicts with the application and registration steps outlined in the PTO's administrative review process and regulations. *Id.* at 37–44. In other words, Berger contends the Board erred by applying a more stringent threshold for bona fide intent than required by statute or by the PTO's regulations and procedures.

We disagree. Nowhere did the Board state that the applicable standard requires an applicant to have actually promoted, developed, and marketed the mark at the time of the application. Nor did the Board state that it applied such a standard. To the contrary, the Board's opinion reflects that it reached its conclusions by considering all the relevant facts and circumstances, including those that indicated Berger lacked intent. This is indeed the proper inquiry under the Lanham Act. 15 U.S.C. § 1051(b)(1) (intent to use must be "under circumstances showing the good faith of such person").

We also find that the Board's opinion is not inconsistent with PTO practice. The PTO is within its discretion to allow intent-to-use applications to proceed, at the time of filing, upon only a verified statement of bona fide intent to use. *See id.* § 1051(b)(3)(B). However, the agency has the statutory authority to seek further evidence of the applicant's "bona fide" intent. *See id.* § 1051(b)(1). Indeed, not only did the agency contemplate that an applicant's intent to use may be at issue in *inter partes* proceedings, but it reserved the right to make its own inquiry into the issue under appropriate circumstances:

> Generally, the applicant's sworn statement of a bona fide intention to use the mark in commerce will be sufficient evidence of good faith in the ex parte context. Consideration of issues related to good faith may arise in an inter partes proceeding,

but the USPTO will not make an inquiry in an ex parte proceeding unless evidence of record clearly indicates that the applicant does not have a bona fide intention to use the mark in commerce.

Trademark Manual of Examining Procedure (TMEP) § 1101.

We find that the Board did not err in its application of the standard for bona fide intent. As discussed *supra*, whether an applicant has a bona fide intent to use a mark in commerce is an objective inquiry based on the totality of the circumstances. The Board conducted such an inquiry.

## IV. CONCLUSION

We have considered Berger's remaining arguments and find them unavailing. For the foregoing reasons, we conclude that the Board properly sustained the opposition on the basis that Berger lacked a bona fide intention to use the mark in commerce at the time of the application.

**AFFIRMED**