THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing: February 25, 2025                    Mailed: August 14, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*SawStop, LLC*
*v.*
*Felder KG*

_____

Opposition No. 91255905

_____

Toby Butterfield and Rebecca Zittell Green of Moses & Singer LLP,
    for SawStop, LLC.

Rebeccah Gan of Muncy, Geissler, Olds & Lowe, P.C.,
    for Felder KG.

_____

Before Heasley, Dunn, and Lavache,
    Administrative Trademark Judges.

Opinion by Lavache, Administrative Trademark Judge:

Felder KG ("Applicant") filed a request for extension of protection of an international registration under Trademark Act Section 66(a), 15 U.S.C. § 1141f(a), seeking registration on the Principal Register of the standard character mark PCS for goods ultimately identified as:

> Stationary woodworking systems comprising circular saws, band saws, table saws, panel saws, electric sanders, spindle motors, shapers, drilling

machines, and safety devices attended thereto; stationary sliding table saw systems comprising band saws, table saws, panel saws, electric sanders, spindle motors, shapers, drilling machines, and safety devices attended thereto, all of the foregoing for use in woodworking and for cutting off finished plastics, in International Class 7.[1]

SawStop, LLC ("Opposer") opposes registration of Applicant's mark based on (1) likelihood of confusion under Trademark Act Section 2(d), 15 U.S.C. § 1052(d); and (2) Applicant's alleged lack of a bona fide intent to use the mark in commerce for all of the identified goods in its request for extension of protection as of the request's filing date.[2] In support of the likelihood-of-confusion claim, Opposer alleges prior common law rights in the mark PCS for table saws and table saws with active injury

---

[1] Application Serial No. 79258755, a request for extension of protection under Section 66(a) of the Trademark Act, 15 U.S.C. § 1141f(a), based on International Registration No. 1466799 and filed on April 12, 2019, has been accorded a priority date of December 13, 2018. *See* 15 U.S.C. §§ 1141f(b), 1141g.

[2] Notice of Opposition, 1 TTABVUE; Opposer's Main Brief, 74 TTABVUE. Opposer cites Trademark Act Section 1(b) in support of its claim that Applicant lacks a bona fide intent to use the mark in commerce. But Applicant based its application on Trademark Act Section 66(a), not Section 1(b). However, like Section 1(b), Section 66(a) includes a requirement that the applicant submit a verified declaration of a bona fide intent to use the mark in commerce. Accordingly, in this case, the correct statutory basis for Opposer's claim is Section 66(a). *See Societe Des Produits Nestle S.A. v. Taboada*, Opp. No. 91232597, 2020 TTAB LEXIS 267, at *5 n.5 (TTAB 2020). We consider the claim sufficiently pleaded despite the incorrect statutory citation, as "the wording and import of the claim (i.e., 'lack of a bona fide intention to use the mark in commerce') are otherwise identical." *Id.* at *15 n.17.

Citations to the record refer to TTABVUE, the Board's online docketing system. The number preceding TTABVUE corresponds to the docket entry number, and any numbers following "TTABVUE" refer to the page numbers of the docket entry where the cited materials appear. In addition, case citations in this opinion are in a form set out in the TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 101.03 (2025). This opinion cites decisions of the U.S. Court of Appeals for the Federal Circuit and the U.S. Court of Customs and Patent Appeals by the pages on which they appear in the Federal Reporter (e.g., F.2d, F.3d, or F.4th). For decisions of the Board and the Director of the USPTO, this opinion cites to the Lexis legal database and, in the initial full citation of a case, also identifies the number of the Board proceeding, if available. Practitioners should also adhere to the practice set forth in TBMP § 101.03.

mitigation technology, and claims ownership of later-filed Application Serial No. 88409410,[3] seeking registration on the Principal Register of the standard character mark PCS for "table saws and table saws with active injury mitigation technology."[4]

Applicant's answer denies most of the salient allegations asserted in the notice of opposition, but admits: that Applicant had not used its PCS mark on the goods identified in the application prior to the filing date of Applicant's application, or prior to Opposer's alleged March 11, 2009, dates of use; that Opposer owns Application Serial No. 88409410; and that Opposer's pleaded application has been suspended in view of Applicant's application.[5]

The case is fully briefed,[6] and an oral hearing was held on February 25, 2025. As explained below, the opposition is **dismissed** as to Opposer's claim under Section 2(d), and **dismissed in part** and **sustained in part** as to Opposer's claim based on lack of bona fide intent under Section 66(a).

---

[3] Application Serial No. 88409410 was filed on April 30, 2019, based upon Opposer's allegation of use in commerce under Trademark Act Section 1(a), 15 U.S.C. § 1051(a), claiming March 11, 2009, as both the date of first use and the date of first use in commerce.

[4] Notice of Opposition, 1 TTABVUE 4-6.

[5] Applicant's Answer, 7 TTABVUE 3-4. Applicant's answer asserted a number of affirmative defenses, namely, laches, acquiescence, estoppel, waiver, and failure to state a claim upon which relief may be granted. *Id.* at 5. "Failure to state a claim is not a true affirmative defense and will be given no consideration because it relates to an assertion of the insufficiency of the pleading rather than a statement of a defense to the merits of a claim." *Tequila Cuadra S. de RL de CV v. Manufacturera de Botas Cuadra, S.A. de C.V.*, Opp. No. 91282327, 2025 TTAB LEXIS 207, at *2-3 (TTAB 2025); *John W. Carson Found. v. Toilets.com, Inc.*, Opp. No. 91181092, 2010 TTAB LEXIS 226, at *25 (TTAB 2010). Further, Applicant did not argue any of the asserted affirmative defenses in its brief. Accordingly, all of the defenses are impliedly waived. *See, e.g.*, *Alcatraz Media, Inc. v. Chesapeake Marine Tours, Inc.*, Can. No. 92050879, 2013 TTAB LEXIS 347, at *5 n.6 (TTAB 2013), *aff'd mem.*, 565 F. App'x 900 (Fed. Cir. 2014).

[6] Opposer's Main Brief, 74 TTABVUE; Applicant's Brief, 90 TTABVUE; Opposer's Reply Brief, 91 TTABVUE.

## I. The Record

The record includes the pleadings, the submissions of the parties during their respective trial periods, and, by rule, Applicant's involved application file. *See* Trademark Rule 2.122(b)(1), 37 C.F.R. § 2.122(b)(1). Although we do not list the contents of the record, it has been reviewed and considered in its entirety. *See Quiktrip W., Inc. v. Weigel Stores, Inc.*, 984 F.3d 1031, 1036 (Fed. Cir. 2021) ("We have held 'on multiple occasions that failure to explicitly discuss every issue or every piece of evidence does not alone establish that the tribunal did not consider it.'" (quoting *Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1328 (Fed. Cir. 2017))); *In re Miracle Tuesday LLC*, 695 F.3d 1339, 1348 (Fed. Cir. 2012) ("[T]he mere fact that the Board did not recite all of the evidence it considered does not mean the evidence was not, in fact, reviewed." (citing *Plant Genetic Sys., N.V. v. Dekalb Genetics Corp.*, 315 F.3d 1335, 1343 (Fed. Cir. 2003))).

## II. Evidentiary Objections

Opposer attached to its main brief a Statement of Objections, in which Opposer objected to a discovery deposition transcript Applicant sought to introduce through a notice of reliance, as well as exhibits purportedly submitted during the cross-examination of certain witnesses.[7] Applicant's brief, in turn, sets forth Applicant's

---

[7] 74 TTABVUE 54-59. Opposer further addressed its objections in an attachment to its reply brief. *See* 91 TTABVUE 29-33.

responses to these objections,[8] as well as Applicant's own objections to testimony and evidence from Opposer's testimonial witnesses.[9]

We find it unnecessary to make specific rulings on these objections. The Board is capable of assessing the proper evidentiary weight to be accorded the testimony and evidence, taking into account the concerns raised by the objections. *Inter IKEA Sys. B.V. v. Akea, LLC*, Opp. No. 91196527, 2014 TTAB LEXIS 166, at *4-5 (TTAB 2014); *see also Hangzhou Mengku Tech. Co. v. Shanghai Zhenglang Tech. Co.*, Opp. No. 91272143, 2024 TTAB LEXIS 575, at *9 (TTAB 2024) ("Administrative Trademark Judges are not lay jurors who might easily be misled, confused, or prejudiced by irrelevant or unreliable evidence."). Accordingly, in our analysis below, we have cited any evidence we have credited, and we have given no weight to factual assertions that are not supported by evidence properly introduced into the record. *See Pierce-Arrow Soc'y v. Spintek Filtration, Inc.*, Opp. No. 91224343, 2019 TTAB LEXIS 388, at *9 (TTAB 2019); *Krause v. Krause Publ'ns Inc.*, Can. No. 92041171, 2005 TTAB LEXIS 487, at *10 (TTAB 2005) ("Where we have relied on testimony to which respondent objected, it should be apparent to the parties that we have deemed the material both admissible and probative to the extent indicated in the opinion.").

## III. Opposer's Entitlement to a Statutory Cause of Action

Establishing an entitlement to a statutory cause of action is a threshold requirement in every inter partes case. *See Corcamore, LLC v. SFM, LLC*, 978 F.3d

---

[8] 90 TTABVUE 62-68.

[9] *Id.* at 12.

1298, 1303 (Fed. Cir. 2020); *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 1373 (Fed. Cir. 2020). Thus, Opposer, as plaintiff in this opposition proceeding, must prove its entitlement to a statutory cause of action by a preponderance of the evidence. *See, e.g.*, *Made in Nature, LLC v. Pharmavite LLC*, Opp. No. 91223352, 2022 TTAB LEXIS 228, at *8 (TTAB 2022).

To establish an entitlement to a statutory cause of action, Opposer must demonstrate that it has: (1) an interest falling within the zone of interests protected by the statute, and (2) a reasonable belief in damage proximately caused by the registration of the mark. *Curtin v. United Trademark Holdings, Inc.*, 137 F.4th 1359, 1367 (Fed. Cir. 2025) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-134 (2014)); *Corcamore*, 978 F.3d at 1304-07; *see also Made in Nature*, 2022 TTAB LEXIS 228, at *18.

Here, Opposer has introduced testimony and documentary evidence to support its allegation of prior use of PCS,[10] forming the basis of a likelihood-of-confusion claim that is not wholly without merit. *See, e.g.*, *Exec. Coach Builders, Inc. v. SPV Coach Co.*, Opp. No. 91212312, 2017 TTAB LEXIS 201, at *17-19 (TTAB 2017). The record also contains evidence showing that Opposer's Application Serial No. 88409410, seeking registration of the standard character mark PCS for "table saws and table saws with active injury mitigation technology,"[11] was suspended by the USPTO pending disposition of Applicant's prior-filed Application Serial No. 79258755 for the

---

[10] *See, e.g.*, Opposer's Main Brief, 74 TTABVUE 11-13 (referencing specific testimony and evidence of alleged prior use of PCS).

[11] Opposer's Second Notice of Reliance, 33 TTABVUE 10-16.

standard character mark PCS,[12] which is the subject of this proceeding. The USPTO's suspension action states that if the mark in Applicant's prior-filed application registers, it may be cited as a bar to registration of Opposer's mark under Trademark Act Section 2(d) based on a likelihood of confusion.[13]

Therefore, Opposer has demonstrated, by a preponderance of the evidence, that it has a real interest in the proceeding and a reasonable belief that it would be damaged by the registration of Applicant's mark, thus establishing Opposer's entitlement to bring and maintain this opposition under Trademark Act Section 13, 15 U.S.C. § 1063, on the ground of likelihood of confusion. *See Corcamore*, 978 F.3d at 1306; *Life Zone Inc. v. Middleman Grp., Inc.*, Opp. No. 91160999, 2008 TTAB LEXIS 37, at *17-18 (TTAB 2008) (finding evidence that opposer's application was suspended pending disposition of applicant's application demonstrated opposer's reasonable belief that it would be damaged by registration of applicant's mark).

Because Opposer has established its entitlement to a statutory cause of action for its asserted likelihood-of-confusion claim, it may also assert its claim based on lack of bona fide intent. *See Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1377 (Fed. Cir. 2012) ("[O]nce an opposer meets the requirements for [statutory entitlement], it can rely on any of the statutory grounds for opposition set forth in . . . [the Trademark Act]); *Enbridge, Inc. v. Excelerate Energy LP*, Opp. No.

---

[12] *Id.* at 18-22.

[13] *Id.* at 18. Again, Applicant admits that Opposer's application is suspended in view of Applicant's application. 7 TTABVUE 3.

91170364, 2009 TTAB LEXIS 642, at *21 n.10 (TTAB 2009) ("If an opposer can show standing as to one ground, it has the right to assert any other ground as well.").

## IV. Priority and Likelihood of Confusion

Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), permits opposition to registration of an applied-for mark based on likelihood of confusion with "a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States . . . and not abandoned." Opposer has not pleaded ownership of a prior registration for PCS, and it filed its pleaded application for PCS after Applicant filed its own application for PCS. Thus, Opposer must establish prior proprietary rights (i.e., priority) in the pleaded common-law mark PCS. *Otto Roth & Co. v. Universal Foods Corp.*, 640 F.2d 1317, 1320 (CCPA 1981); *see also Life Zone*, 2008 TTAB LEXIS 37, at *21 (noting that an opposer's later-filed application provides no basis for priority).

> Under the rule of *Otto Roth*, a party opposing registration of a trademark due to a likelihood of confusion with his own unregistered term cannot prevail unless he shows that his term is distinctive of his goods, whether inherently or through the acquisition of secondary meaning or through "whatever other type of use may have developed a trade identity."[14]

*RxD Media, LLC v. IP Application Dev. LLC*, Opp. No. 91207333, 2018 TTAB LEXIS 37, at *22 (TTAB 2018) (quoting *Towers v. Advent Software Inc.*, 913 F.2d 942, 945

---

[14] The Board previously denied Opposer's motion for leave to file an amended notice of opposition to assert priority based on "analogous use of the PCS mark." 13 TTABVUE 3-5. Therefore, the issue of analogous use is not part of the pleadings and is not considered in this opinion.

(Fed. Cir. 1990)), *aff'd*, 377 F. Supp. 3d 588 (E.D. Va. 2019), *aff'd*, 986 F.3d 361 (4th Cir. 2021).

In other words, to prevail on its Section 2(d) claim here, Opposer must establish that it used its PCS designation as a distinctive source identifier in commerce prior to the first actual or constructive use of Applicant's PCS mark. *See Otto Roth*, 640 F.2d at 1320; *DowntownDC Bus. Improvement Dist. v. Clarke*, Opp. No. 91275100, 2024 TTAB LEXIS 412, at *38 (TTAB 2024) (citing *Araujo v. Framboise Holdings Inc.*, 99 F.4th 1377, 1380 (Fed. Cir. 2024)).

### A. Applicant's Priority Date

Generally, in the absence of evidence demonstrating an earlier use date, an applicant may rely on the filing date of its subject application to establish the applied-for mark's constructive date of first use. *See* Trademark Act Section 7(c), 15 U.S.C. § 1057(c) (filing an application constitutes constructive use of the mark, conferring a right of priority contingent upon registration); *Syngenta Crop Prot., Inc. v. Bio-Chek, LLC*, Opp. No. 91175091, 2009 TTAB LEXIS 70, at *18 (TTAB 2009). In this case, though, Applicant's subject application is a request for extension of protection under Trademark Act Section 66(a), 15 U.S.C. § 1141f(a). Therefore, Applicant may rely on the request's earlier claimed priority date under Trademark Act Section 67, 15 U.S.C. § 1141g, based on the date of the international filing underlying the request for extension of protection. *See, e.g.*, *Compagnie Gervaise Danone v. Precision Formulations, LLC*, Opp. No. 91179589, 2009 TTAB LEXIS 1, at *6-7 (TTAB 2009).

Here, the claimed priority date in Applicant's request for extension of protection is December 13, 2018,[15] and Applicant has not argued for, or provided evidence of, an earlier date of first use. Nor does Opposer contest that Applicant may rely on its claimed priority date as its constructive date of first use.[16] Accordingly, the earliest date Applicant may rely on for priority is December 13, 2018.

### B. Opposer's Priority Date

Opposer must therefore establish by a preponderance of the evidence use of its pleaded PCS designation as a distinctive mark (through either inherent or acquired distinctiveness) prior to Applicant's constructive first use date of December 13, 2018. *See DeVivo v. Ortiz*, Opp. No. 91242863, 2020 TTAB LEXIS 15, at *9-10 (TTAB 2020); *Exec. Coach Builders*, 2017 TTAB LEXIS 201, at *19. In considering the testimony and evidence of priority, we "look at the evidence as a whole, as if each piece of evidence were part of a puzzle which when fitted together, establishes prior use." *W. Fla. Seafood, Inc. v. Jet Rests., Inc.*, 31 F.3d 1122, 1125-26 (Fed. Cir. 1994).

---

[15] Under Trademark Act Section 67, 15 U.S.C. § 1141g, "an applicant is entitled to claim a date of priority when it holds an international registration, makes a request for extension of protection (application) to the U.S., includes a claim of priority based on a right of priority under Article 4 of the Paris Convention for the Protection of Industrial Property, and the date of the international registration is within six months of the filing date of the application underlying the international registration." *Precision Formulations*, 2009 TTAB LEXIS 1, at *6-7. The international registration underlying Applicant's request for extension of protection issued on April 12, 2019 and is based on a European Union application filed on December 13, 2018. Thus, Applicant is entitled to its claimed priority date of December 13, 2018. *See* Trademark Act Section 66(b), 15 U.S.C. § 1141f(b).

[16] Opposer does not argue against Applicant's reliance on its claimed priority date, but does incorrectly identify that date as April 12, 2019. *See* Opposer's Main Brief, 74 TTABVUE 19. (asserting that "[i]n its Application, Applicant stated that its priority date under Section 66(a) of the Trademark Act, based on International Registration No. 1466799, is April 12, 2019").

Here, Opposer argues that Applicant's priority date is "more than a decade after Opposer first adopted and started using the PCS Mark on its advertising materials, goods, and related products."[17] Specifically, Opposer asserts that, in 2008, it "introduced a new product called the 'Professional Cabinet Saw,'" for "a line of table saws," "immediately started to use the acronym 'PCS' to identify its latest table saw products ('PCS Saw' or 'PCS Saws'),"[18] and has continuously used its alleged mark since then.[19]

Applicant, for its part, acknowledges that Opposer began using the PCS designation in connection with Opposer's professional cabinet saws in 2009,[20] the year of Opposer's alleged "first sale of a PCS saw in interstate commerce in the United States."[21] Applicant argues, however, that Opposer's use of PCS was not trademark use and thus does not establish Opposer's priority.[22] Specifically, Applicant contends that, at least up until Applicant's priority date, Opposer's use of PCS "was almost purely as part of an alphanumeric model designation or side by side with the generic indicator, i.e., professional cabinet saw."[23] Applicant further asserts that, beyond the use of PCS as "a mere model number," Opposer's "consumer[-]facing usage [of PCS]

---

[17] *Id.* at 20.

[18] *Id.* at 11.

[19] *Id.* at 12.

[20] Applicant's Brief, 90 TTABVUE 13.

[21] Opposer's Main Brief, 74 TTABVUE 12.

[22] *See* Applicant's Brief, 90 TTABVUE 15-24.

[23] *Id.* at 20.

was *de minimis* usage of descriptive matter that could not and did not yield secondary meaning within the consumer consciousness."[24]

### 1. Designation Must be Distinctive

Underlying Applicant's arguments are the principles that "not every designation that is placed or used on a product necessarily functions as a trademark for said product and not every designation adopted with the intention that it perform a trademark function necessarily accomplishes that purpose." *D.C. One Wholesaler, Inc. v. Chien*, Opp. No. 91199035, 2016 TTAB LEXIS 536, at *8 (TTAB 2016) (citing *In re Eagle Crest, Inc.*, Ser. No. 77114518, 2010 TTAB LEXIS 346, at *6 (TTAB 2010)); *see also Am. Velcro, Inc. v. Charles Mayer Studios, Inc.*, Can. No. 92009159, 1973 TTAB LEXIS 11, at *19 (TTAB 1973). "[T]he central question in determining whether [a] proposed mark functions as a [trademark] is the commercial impression it makes on the relevant public (e.g., whether the term sought to be registered would be perceived as a mark identifying the source of the [goods])." *In re Keep A Breast Found.*, Ser. No. 85316199, 2017 TTAB LEXIS 259, at *14 (TTAB 2017); *see also Eagle Crest*, 2010 TTAB LEXIS 346, at *6.

Relevant to our analysis here, "[i]t is well settled that terms used **merely** as model, style, or grade designations . . . do not serve to identify and distinguish one party's goods from similar goods manufactured and/or sold by others." *In re Dana Corp.*, Ser. No. 73655454, 1989 TTAB LEXIS 34, at *2 (TTAB 1989) (emphasis added). "This is so because such a designation serves as a description of the product,

---

[24] *Id.* at 27.

informing one of the quality, size or type of the particular product, rather than serving as an identifier of the source of the goods." *Id.* Thus, model designations may provide customers with product compatibility information with respect to parts, accessories, and fittings for goods. *See In re Otis Eng'g Corp.*, Ser. No. 73279104, 1983 TTAB LEXIS 225, at *2-3, *5 (TTAB 1983) (noting that applicant's X designation indicated compatibility across pieces of equipment). And they also may facilitate the ordering and purchasing of goods by providing a shorthand way to differentiate between a company's various product types or product lines. *See, e.g.*, *In re Waldes Kohinoor, Inc.*, 1960 TTAB LEXIS 65, at *2-3 (TTAB 1960) (finding numerals on retaining rings only functioned to "differentiate one type of applicant's retaining rings from its other types"). But, unless a model designation is also perceived by the relevant public as identifying a single commercial source, it does not function as a trademark. *See Dana Corp.*, 1989 TTAB LEXIS 34, at *2; *In re Petersen Mfg. Co.*, Ser. No. 73394687, 1986 TTAB LEXIS 114, at *9 (TTAB 1986); *Otis Eng'g*, 1983 TTAB LEXIS 225, at *5 (reversing refusal where applicant's X designation functioned as a trademark in addition to indicating product compatibility).

Accordingly, in determining whether a designation will be perceived merely as a model designation, we consider not only the manner and context of its use–including its size, stylization, and placement on the goods or associated materials–but also whether there is any evidence that the relevant public recognizes it as an indicator of source. *See, e.g.*, *Dana Corp.*, 1989 TTAB LEXIS 34, at *2; *Petersen Mfg.*, 1986 TTAB LEXIS 114, at *3-9; *Otis Eng'g*, 1983 TTAB LEXIS, at *2-3, *5; *see also*

TRADEMARK MANUAL OF EXAMINING PROCEDURE §§ 1202.16(b)(i), (i)(A), (i)(B), (i)(C) (May 2025). And, where an opposer seeks to establish priority based on the recognition of its designation as a source indicator, such recognition must have existed before the applicant's priority date. *See DeVivo*, 2020 TTAB LEXIS 15, at *9-10.

### 2. Whether Opposer's PCS Designation is Inherently Distinctive

With the parties' arguments and the relevant legal framework in mind, we now consider the evidence of Opposer's use of PCS in connection with table saws and table saws with active injury mitigation technology.

In support of the contention that it "first introduced its PCS saw . . . to the woodworking industry (and started using the PCS Mark on and in connection with its table saws) in August 2008 at the International Woodworking Fair ('IWF') in Atlanta, Georgia,"[25] Opposer provided a copy of a flyer that was placed on a table saw at the IWF, presumably as part of a point-of-sale display,[26] as shown below.[27]

---

[25] Opposer's Main Brief, 74 TTABVUE 11.

[26] *See, e.g., In re Ancha Elecs. Inc.*, Ser. No. 73423091, 1986 TTAB LEXIS 36, at *7 (TTAB 1986) (holding that "an informational flyer or leaflet clearly depicting the mark and presented on the goods at trade show exhibits are acceptable displays associated with the goods").

[27] Opposer's Testimony Declaration (Howard), 38 TTABVUE 3, 13 (flyer); Opposer's Testimony Declaration (Fanning), 37 TTABVUE 3, 9 (photograph).



Opposer's PCS designation appears at the top of the flyer in the following text:

> The SawStop Professional Cabinet Saw (PCS) provides safety, performance and value. Featuring our patented Safety System and professional-grade features at an affordable price, the PCS delivers SawStop quality to smaller shops and discerning woodworkers.

Notably, the flyer indicates that the saw is "Available Spring 2009," which suggests that, at the time the flyer was displayed, the goods had yet to be sold or transported in commerce, as is required to establish use in commerce of a mark on goods under Trademark Act Section 45, 15 U.S.C. § 1127. Aside from that, as used in the flyer, PCS first appears parenthetically after the phrase "Professional Cabinet Saw" and is later used as a shorthand reference to the "Professional Cabinet Saw." Thus, rather than serving as an indicator of source, it is likely to be understood simply as an abbreviation of that descriptive phrase. Indeed, when Opposer's CEO Matthew J.

Howard was asked during a discovery deposition whether Opposer "selected the . . . term PCS as a model name because it is an abbreviation for professional cabinet saw," he testified, "That's how they began it, yes."[28] He did not deny that PCS was "selected . . . as a model name" or that it is an abbreviation of "professional cabinet saw."[29]

Significantly, the phrase "professional cabinet saw" itself appears to be merely descriptive of Opposer's saws, if not generic. The flyer refers to the "professional-grade features" of the saw and includes a photo showing that the saw includes a cabinet that houses the saw's motor.[30] And the owner's manual for Opposer's 10″ Professional Cabinet Saw repeatedly describes the saw's "cabinet."[31] Further, excerpts from Opposer's website in 2013 refer to its saw as "THE #1 SELLING CABINET SAW."[32] Thus, while we disagree with Applicant that the evidence supports the conclusion that PCS is descriptive of professional cabinet saws generally,[33] we do

---

[28] Applicant's Second Notice of Reliance, 67 TTABVUE 26.

[29] *Id. See also* Opposer's Testimony Declaration (Howard), 38 TTABVUE 3 (testifying that "Opposer selected Opposer's Mark as an acronym for 'Professional Cabinet Saw'").

[30] During cross-examination, Applicant's counsel asked Patrick Scott Cassilly, Opposer's Regional Sales Manager, whether a "cabinet saw" is a "table saw with a cabinet" and whether "the cabinet on the cabinet saw house[s] the mechanics of the saw." He answered "Yes" to both questions. 82 TTABVUE 16. Mr. Cassilly was also asked, "What is a professional cabinet saw?" and "What does the word professional mean in the context of the table saw that SawStop sells?" *Id.* at 21. His answers were, respectively, "A saw that is used professionally," and "It's designed for professional use." *Id.*

[31] Applicant's Second Notice of Reliance, 67 TTABVUE 365 (instructing user to "remove all cardboard pieces from the inside of the cabinet" of the saw), 386 (indicating that a mobile base "attaches to the cabinet" of the saw), 394 (referring to the saw's "Cabinet footprint" and "cabinet dust collection port diameter" in a specification listing).

[32] *See* Opposer's Testimony Declaration (Fanning), 37 TTABVUE 28-32.

[33] Applicant asserts that "PCS" is "an initialism for professional cabinet saw," 90 TTABVUE 13, and later argues that "abbreviations of generic terms should likewise be considered generic and non-functional matter." *Id.* at 25 n.7. However, as Opposer correctly notes, the

find that, as Opposer used it here and in its other uses discussed below, PCS would be viewed merely as an abbreviation of the descriptive phrase "professional cabinet saw" and not as a trademark.

Opposer's evidence also includes the following use of PCS in connection with its table saws.[34]



relevant case law "is clear that an acronym or initialism is not considered descriptive unless it has become 'so generally understood as representing descriptive words as to be accepted as substantially synonymous' with those words." Opposer's Reply Brief, 91 TTABVUE 7 (quoting *Mod. Optics, Inc. v. Univis Lens Co.*, 234 F.2d 504, 506 (CCPA 1956)). Here, the evidence of record falls short of establishing that, as a general matter, consumers view PCS to be a descriptive (or generic) initialism of "professional cabinet saw" outside of Opposer's use in connection with its own goods.

[34] Opposer's Testimony Declaration (Fanning), 37 TTABVUE 13.

Opposer describes the above example as "a label attached to the exterior of its PCS Saws ever since it first sold a table saw bearing its PCS Mark on March 9, 2009."[35] On this label, "PCS" appears in relatively small font in the phrase "Model No. PCS 31230," just above the unit's serial number, along with other information about the saw's horsepower and electrical specifications. In this context, consumers would likely view PCS as nothing more than part of a model number, especially considering that other matter on the label appears to be functioning as the source identifier for the goods.[36]

PCS is similarly employed on the product packaging below,[37] which Opposer claims was "used from 2009 until late 2020/early 2021."[38]

---

[35] Opposer's Main Brief, 74 TTABVUE 13.

[36] That is, it is likely that the wording "SawStop" will be perceived as the trademark for the goods in this example, as it appears prominently in larger, stylized font at the top of the label and features the federal trademark registration symbol. *Cf., e.g.*, *In re Sones*, 590 F.3d 1282, 1289 (Fed. Cir. 2009) ("Though not dispositive, the 'use of the designation "TM" . . . lends a degree of visual prominence to the term.'" (quoting *In re Dell Inc.*, Ser. No. 75851765, 2004 TTAB LEXIS 442, at *11 (TTAB 2004))); *In re Lytle Eng'g & Mfg. Co.*, 1960 TTAB LEXIS 119, at *2 (TTAB 1960) (finding proposed mark to be displayed in the manner of a trademark where it was applied to the goods in a "lettering distinctly different" from other wording on the goods) (no number in original).

[37] Opposer's Testimony Declaration (Fanning), 37 TTABVUE 18 (packaging displaying the wording PCS175), 19-20 (packaging showing the wording PCS31230 and Model PCS31230).

[38] Opposer's Main Brief, 74 TTABVUE 14.






In the upper-left example above, PCS appears as part of the alphanumeric phrase "PCS31230," and is displayed along with other informational matter or descriptive wording about the goods, including the wording "3 hp," "10″ Professional Cabinet Saw," and a depiction of a table saw. The upper-right example above appears to show the side of the same box, which displays the same alphanumeric phrase directly after

the term "Model," denoting that the phrase identifies the particular model of the saw. The third example above shows similar use, displaying the alphanumeric phrase "PCS175" on the box under the wording "1.75 hp" and next to a depiction of a table saw. In these examples, the numerical portion of the alphanumeric phrase is apparently based, in whole or in part, on the horsepower rating of the saw. Thus, the 1.75-horsepower saw carries the "PCS**175**" designation (emphasis added), while 3-horsepower saw carries the "PCS**3**1230" designation (emphasis added).[39] Again, this use of PCS is consistent with use as a model designation, and consumers would be unlikely to view it as anything else. This is especially so given the prominent display on the boxes of matter that consumers would likely perceive as a trademark for the goods: a relatively large logo consisting of the stylized wording SawStop partially superimposed over a depiction of a sawblade.[40]

---

[39] The owner's manual for Opposer's Model PCS31230 saw indicates that the saw is for use with "single phase 230V, 60Hz power outlets." Applicant's Second Notice of Reliance, 67 TTABVUE 354. And a price list/order form for Opposer's various saws similarly includes the following horsepower/electrical specifications for Opposer's 3-horsepower "Professional Cabinet Saw": "3.0HP 1ph 230v 60Hz." Applicant's Second Notice of Reliance, 68 TTABVUE 6. Thus, the "1" and "230" in the alphanumeric phrase PCS31230 appear to be based on the particular saw's number of phases (1) and voltage (230).

[40] Notably, according to Opposer, it "changed the packaging for its PCS Saws in late 2020 or early 2021." Opposer's Testimony Declaration (Fanning), 37 TTABVUE 4. The new packaging shows "PCS" with a TM designation in a relatively large font, appearing next to the saw's horsepower rating and above "PCS175" or "PCS31230," which is displayed in smaller font. *See id.* at 23. Applicant characterizes this change as being part of Opposer's "post-2020 sprint to start using 'PCS' as a mark in connection with its professional cabinet saws." Applicant's Brief, 90 TTABVUE 27. Opposer's post-2020 use of the PCS designation is of little relevance to our priority inquiry, and we need not otherwise address Applicant's implication that the change could be construed as Opposer's attempt to address the possibility that its pre-2020 use has been perceived as designating a model type or serving some other non-trademark purpose.

The record also contains copies of the owners' manuals for Opposer's "Professional Cabinet Saws" printed in 2012, the covers of which are reproduced below.[41]



Again, this evidence shows PCS as part of the respective model numbers for the saws, which appear in very small, non-stylized font under descriptive wording, in stark contrast to what appears to be the actual source-indicating matter (SawStop®), which is displayed in larger, stylized, red font at the top of the page and is expressly designated as a registered trademark.

---

[41] Applicant's Second Notice of Reliance, 67 TTABVUE 344, 361.

Opposer argues that, aside from the above uses, its prior use of PCS includes instances where it serves "as a standalone identifier, separate from any model designation,"[42] and points to the following examples from Opposer's website,[43] as it appeared in 2013:[44]

---

[42] Opposer's Reply Brief, 91 TTABVUE 16.

[43] *Id.*

[44] *See* Opposer's Third Notice of Reliance, 34 TTABVUE 31, 33; Opposer's Testimony Declaration (Fanning), 37 TTABVUE 31-32. In his declaration, David Fanning, Opposer's Vice President and General Counsel, states that these examples are "true and correct copies of Wayback Machine captures I had captured for me, which display pages of Opposer's Website as they appeared on . . . June 29, 2013." 37 TTABVUE 4-5. "In proceedings before the Board, Wayback Machine printouts, like other Internet webpages that display a URL and date, generally can be admissible under a notice of reliance as self-authenticating Internet evidence" and, if supported solely by a notice of reliance, they would be admissible only for what they show on their face. *Spiritlines Cruises LLC v. Tour Mgmt. Servs.*, Opp. No. 91224000, 2020 TTAB LEXIS 3, at *10 (TTAB 2020) (citing Trademark Rule 2.122(e)(2), 37 C.F.R. § 2.122(e)(2)). Here, Opposer is relying on these Wayback Machine printouts not only for what they show on their face, i.e., how PCS is being used on Opposer's website, but also to establish that the content shown appeared on the website as of a particular date, i.e., "the 'truth' of the capture as of the archive date." *Id.* at *12. Opposer must therefore properly authenticate and lay the appropriate foundation for us to consider the evidence for that latter purpose. *See id.* at *10-11. We find that Opposer has done so here through Mr. Fanning's testimony. Specifically, his declaration states that he has been Opposer's Vice President and General Counsel since Opposer's founding in August 2000 and that his "responsibilities include participating in the management of the company, including participating in decisions about what products to make and sell . . ., overseeing all legal issues of the company, including all issues related to the company's . . . trademarks, . . . and participating in . . . dealings with customers and competitors." 37 TTABVUE 2-3. Thus, Mr. Fanning has the requisite knowledge and experience to authenticate that these excerpts accurately reflect what appeared on Opposer's website as of June 29, 2013. *See State Permits, Inc. v. Fieldvine, Inc.*, Can. No. 92075095, 2024 TTAB LEXIS 291, at *21-22 (TTAB 2024) (allowing Wayback Machine evidence where it was properly authenticated and the appropriate foundation was laid to support the intended evidentiary use).





In the above examples, PCS appears in the text "A conversion kit makes the Industrial Mobile Base compatible with the PCS," and "Easily move your PCS around your shop." While PCS does not appear within an alphanumeric phrase in these instances, that does not mean that the designation necessarily serves as, or would be perceived as, an indicator of source. In fact, there is little in these examples to suggest that PCS would be perceived as a trademark. In each instance, PCS appears within a sentence in the same size and font of the other text describing the product. *Cf., e.g.*, *In re Osterberg*, Ser. No. 78331176, 2007 TTAB LEXIS 29, at *8-10 (TTAB 2007) (finding consumers unlikely to view a purported mark as a trademark because, inter alia, it appeared within a sentence along with other descriptive text); *In re Aerospace Optics, Inc.*, Ser. No. 76171288, 2006 TTAB LEXIS 126, at *7 (TTAB 2006) (finding a purported mark would not be perceived as a source identifier because it appeared among informational statements about the relevant goods).

More importantly, we cannot view these examples in isolation. Rather, to accurately assess the likely commercial impression of PCS as used in these examples, we must view the use in the context of the other evidence of record. *See W. Fla. Seafood*, 31 F.3d at 1126 (indicating that the Board must consider "the clear interrelationships existing between the several pieces of evidence submitted" and "in light of the rest of the evidence"). With that in mind, below is a webpage from

Opposer's online parts store, as it appeared in 2013,[45] around the same time as Opposer's "standalone" examples immediately above.



On the webpage above, we see that, consistent with other examples of Opposer's use, PCS is identified as a "MODEL TYPE" or a "SAW TYPE" and the reader is instructed that the "Saw model type can be found on the saw body or in the product manual." Thus, this webpage not only specifies PCS as one of the available model types,[46] but predisposes consumers to view PCS as a model designation when used on

---

[45] Opposer's Testimony Declaration (Fanning), 37 TTABVUE 34. As with the Wayback Machine printouts discussed in the immediately preceding footnote, we find that Mr. Fanning's testimony is sufficient to authenticate that this Wayback Machine printout accurately reflects what appeared on Opposer's website as of July 3, 2013. *See id.* at 5. In addition, Applicant has not objected to the introduction of this evidence and, in fact, included the same printout in its Second Notice of Reliance. 67 TTABVUE 317.

[46] A price list/order form for Opposer's various saws shows "PCS," "ICS," and "CNS" used in connection with Opposer's "professional cabinet saw," "industrial cabinet saw," and "contractor saw" respectively. *See* Applicant's Third Notice of Reliance, 68 TTABVUE 6.

the saws and their associated product manuals. When we consider Opposer's examples of "standalone" use of PCS against this backdrop, we find that consumers will perceive PCS not as a trademark, but as a type or model of a SawStop-brand saw (i.e., the professional cabinet saw model) with which the mobile base accessories are compatible.[47]

We find Opposer's additional examples of use below, which date back to 2009,[48] to be similar.

 

---

[47] Consumers could also perceive PCS in these examples as an abbreviation of the descriptive phrase "professional cabinet saw." In either case, however, PCS is not being used in a source-identifying manner.

[48] Opposer's Testimony Declaration (Fanning), 37 TTABVUE 15 (hardware pack), 25 (photo of replacement part).

Opposer describes the example on the left above as a photo of a hardware pack used by consumers when assembling a saw after purchase.[49] A label on the hardware pack includes the wording "PCS Hardware Pack" and "PCS-236," all of which appears below the wording "SawStop." The example on the right above shows a replacement part for Opposer's saws, as well as bins for replacement parts.[50] The replacement part has a label displaying the wording "PCS Elevation Handwheel Lock Knob" and "PCS-162" appearing beneath the wording "SawStop." A parts bin in the background of the photo likewise has a label with the wording "PCS Elevation Handwheel Lock Knob" and "PCS-162." Another bin in the photo has a label containing the alphanumeric phrase "PCS-174," which appears to relate to an "Electrode Shell" replacement part.

Like the other examples above, there are no indications in these examples to suggest use of PCS as a source identifier. Instead, all uses of PCS are operating either as part of descriptive text for a part name (e.g., "PCS Elevation Handwheel Lock Knob") or as a component of a part number. In either case, the purpose is to indicate what type or model of saw the part is used for or compatible with, not who makes it.

Lastly, Opposer asserts that it "has also continuously displayed [its] PCS Mark and advertised its PCS Saws and other goods under Opposer's Mark on Opposer's social media pages, including on Facebook, Instagram, YouTube, and LinkedIn, and has done so for years."[51] In support, Opposer has submitted screenshots from videos

---

[49] Opposer's Main Brief, 74 TTABVUE 13.

[50] *See id.* at 14-15.

[51] *Id.* at 15.

posted by Opposer in 2011 on Opposer's SawStop-branded YouTube channel.[52] In these screenshots, PCS appears in the videos' titles: "PCS Saw Poly V-Ribbed Belts";[53] "PCS Saw Dust Collection";[54] "PCS Saw Integrated Mobile Base";[55] and "PCS Saw Ultra Smooth Operation."[56] The content of these videos is not of record, so we have no context or information, beyond the titles themselves, that would enable us to determine how consumers who encounter the videos would perceive the PCS designation. But in view of Opposer's contemporaneous use of PCS to designate its "professional cabinet saw" type or model of saw, and the fact that the video titles are otherwise apparently descriptive, we find it unlikely that consumers would view PCS in these video titles as a source identifier.

In sum, we find that Opposer's evidence of use of PCS prior to Applicant's December 13, 2018, constructive date of first use, considered as a whole, shows PCS being used solely as a model designation or otherwise in a nondistinctive manner. That is, it does not establish use of PCS that consumers would perceive as an inherently distinctive source identifier in connection with table saws and table saws with active injury mitigation technology.

---

[52] *See* Opposer's Third Notice of Reliance, 34 TTABVUE 39, 41, 43, 45.

[53] *Id.* at 39.

[54] *Id.* at 41.

[55] *Id.* at 43.

[56] *Id.* at 45.

### 3. Whether Opposer's PCS Designation has Acquired Distinctiveness

A model designation, which is not inherently distinctive, may nonetheless acquire distinctiveness as a source identifier. *See Petersen*, 1986 TTAB LEXIS 114, at *6 ("[U]pon a showing that . . . a [model] designation has also acquired recognition by the consuming public as a trademark indicating origin, it is protectible as a trademark."). Therefore, we must determine whether the record establishes that PCS acquired distinctiveness among relevant consumers as a source identifier for the goods at issue here. *See Otto Roth*, 640 F.2d at 1320 (indicating priority may be established by prior use of a mark that is inherently distinctive or has otherwise acquired distinctiveness).

Further, Opposer must show by a preponderance of the evidence that its purported PCS mark acquired distinctiveness prior to Applicant's constructive date of first use, December 13, 2018. *See DeVivo*, 2020 TTAB LEXIS 15, at *9-10; *Exec. Coach Builders*, 2017 TTAB LEXIS 201, at *19; *Threshold.TV, Inc. v. Metronome Enters.*, Opp. No. 91152662, 2010 TTAB LEXIS 314, at *18 (TTAB 2010).

Factors to be considered in determining whether acquired distinctiveness has been established include whether there is any information showing that actual purchasers associate the designation with a particular source (typically measured by customer surveys); the length, degree, and exclusivity of use; the amount and manner of advertising; the amount of sales and number of customers; existence of intentional copying; and any unsolicited media coverage of the goods bearing the designation. *In re SnoWizard, Inc.*, Ser. No. 87134847, 2018 TTAB LEXIS 435, at *15-16 (TTAB 2018)

(quoting *Converse, Inc. v. ITC*, 909 F.3d 1110, 1120 (Fed. Cir. 2018)). We assess the record as a whole, considering only those factors supported by the evidence and keeping in mind that "no single factor is determinative." *Shenzhen IVPS Tech. Co. Ltd. v. Fancy Pants Prods., LLC*, Opp. No. 91263919, 2022 TTAB LEXIS 383, at *46-47 (TTAB 2022) (citations omitted).

"The amount and character of evidence required to establish acquired distinctiveness depends on the facts of each case and the nature of the mark sought to be registered." *In re Gen. Mills IP Holdings II, LLC*, Ser. No. 86757390, 2017 TTAB LEXIS 262, at *6 (TTAB 2017) (citing *Roux Labs., Inc. v. Clairol Inc.*, 427 F.2d 823, 829 (CCPA 1970)). But, the less distinctive a designation is, the heavier the burden in proving it has acquired distinctiveness. *See Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 1581 (Fed. Cir. 1988); *see also In re Jasmin Larian, LLC*, Ser. No. 87522459, 2022 TTAB LEXIS 99, at *45 (TTAB 2022) ("It is axiomatic that 'the lesser the degree of inherent distinctiveness, the heavier the burden to prove that [a mark] has acquired distinctiveness.'" (quoting *In re UDOR U.S.A., Inc.*, Ser. No. 78867933, 2009 TTAB LEXIS 61, at *27 (TTAB 2009))).

Here, we find that Opposer bears a relatively heavy burden, because model designations generally serve a descriptive or informational purpose. *See Petersen*, 1986 TTAB LEXIS 114, at *6 ("[T]he principal objection raised to a model or grade designation asserted as a trademark is analogous to the objection raised to a merely descriptive term asserted as a trademark: both serve primarily to describe the classification or quality of the product, rather than to distinguish the goods of one

party from like goods of others."). And, in this case, the evidence of record establishes that PCS, as used by Opposer, is shorthand for the merely descriptive phrase "professional cabinet saw," is frequently paired with other informational matter (e.g., horsepower designations, part names), and would be perceived as indicating a type or model of saw. Thus, the designation is less likely to perform a source-indicating function in the minds of consumers.

Turning to the evidence, Opposer draws our attention to its sales and promotional activities, claiming that these activities have resulted in strong consumer recognition of PCS as a source identifier for its saws.[57] Opposer notes that "[t]oday, over 600 dealers nationwide" sell its saws;[58] that between 2009 and 2021, "Opposer's total sales of its PCS Saws in the United States exceeded $160 million";[59] that Opposer's annual budget for its promotion and marketing campaigns for its PCS saws grew from $50,000 per year in 2010 to $100,000 per year in 2020;[60] and that its "overall advertising and promotional budget for its products, including Opposer's PCS Saws, amounts to over $1,000,000 per year."[61]

Because Opposer must establish acquired distinctiveness prior to Applicant's constructive first use date of December 13, 2018, evidence pertaining to the time period after that date has little, if any, probative value. Here, Opposer has provided

---

[57] *See* Opposer's Main Brief, 74 TTABVUE 16-19.

[58] *Id.* at 16.

[59] *Id.*

[60] *Id.* at 16-17.

[61] *Id.* at 17.

testimony summarizing sales and promotional figures that cover a time period both before and after Applicant's constructive first use date, without providing further details, such as figures for specific relevant years in that period. Thus, while Opposer's total sales exceeded $160 million between 2009 and 2021, we cannot ascertain what portion of those sales occurred prior to December 13, 2018.

Likewise, we do not know what Opposer's specific promotional and marketing budgets were for its PCS saws, and specifically the PCS designation at issue here, for the years between 2010 and 2018. We therefore cannot gauge the resultant impact on consumer recognition of the PCS designation. In fact, the evidence of record shows that Opposer's "SawStop" mark consistently appears along with the PCS designation on Opposer's saws and packaging and in associated marketing materials. Thus, it is just as likely that Opposer's promotional and marketing expenditures induced and increased the recognition of the "SawStop" mark, rather than the PCS designation.

And, although Opposer's saws are sold by 600 dealers "today," we do not have specific dealer figures for the period between 2009 and 2018. Nor is it clear what effect, if any, the number of dealers had on purchasers' recognition of the PCS designation.

Aside from those issues, we have no way to gauge whether the sales and promotional figures that have been supplied are significant, as Opposer has not provided any information that would enable us to determine whether they are high, low, or somewhere in between, relative to others offering Opposer's type of goods. Even assuming that these figures are significant in the context Opposer's industry,

we cannot conclude, based on this evidence alone, that PCS has acquired distinctiveness in the minds of the relevant consumers. *See In re Tennis Indus. Ass'n*, Ser. No. 77836610, 2012 TTAB LEXIS 76, at *37 (TTAB 2012) ("Sheer numbers alone are not necessarily enough to prove secondary meaning."); *Petersen*, 1986 TTAB LEXIS 114, at *7 ("[S]ales and advertising figures are of little value where there is no showing that [the] designation sought to be registered has been used and promoted as a trademark."). Indeed, "[t]he ultimate test in determining whether a designation has acquired distinctiveness is [Opposer's] success, rather than its efforts, in educating the public to associate the proposed mark with a single source." *Mini Melts, Inc. v. Reckitt Benckiser*, Opp. No. 91173963, 2016 TTAB LEXIS 151, at *54 (TTAB 2016). Here, we have no evidence that any such efforts by Opposer succeeded in creating an association in the minds of consumers between the alleged PCS mark and Opposer as the source of the goods.

Opposer also contends, in support of its claim of acquired distinctiveness, that its saws have "garnered substantial unsolicited media coverage."[62] In support, Opposer has introduced copies of news articles, blog posts, and videos "that discuss Opposer's PCS Saws and reference Opposer's PCS mark starting in 2009."[63] But, like the evidence discussed above, these materials use PCS either as an abbreviation for "professional cabinet saw" or to identify the particular model of SawStop saw being discussed.

---

[62] *Id.*

[63] *Id.*

For instance:

- An excerpt from LumberJocks.com first refers to the "Sawstop PCS,"[64] but later specifies that the author purchased the "PCS 3hp. unit with the 52" fence system,"[65] using PCS to designate the saw's model type.

- An excerpt from ThisOldWorkshop.com first refers to the "SawStop PCS," but never uses "PCS" alone and instead frequently uses "SawStop" by itself, as a source indicator, to refer to Opposer's saw (e.g., "the SawStop has power to spare"; "The quality of this SawStop is unmatched in today's market and the saw cost me less than the comparable Delta or Powermatic would have cost.").

- An excerpt from JaysCustomCreations.com, compares a particular model of a Grizzly-branded saw, the "Grizzly G06090," to the "SawStop PCS," implying that G0690 and PCS are model designations for the respective saws. Further, PCS never appears by itself in this example, but the author consistently uses "SawStop" by itself to refer to Opposer's saw.[66]

We need not discuss Opposer's remaining examples of unsolicited media coverage here, other than to note that they similarly show use of PCS as something other than a source identifier.[67]

---

[64] *See id.* at 37.

[65] *Id.*

[66] Opposer also submitted an article from Popular Woodworking Magazine, which first uses "PCS" in the phrase "SawStop's new Professional Cabinet Saw (PCS)," and continues to use it in that manner throughout the article. Opposer's Third Notice of Reliance, 34 TTABVUE 9-10. Thus, "SawStop" appears to be identifying the source of the saw, while PCS is serving as shorthand for the phrase describing the type of saw, "professional cabinet saw." That said, this article is of little relevance to our inquiry because it post-dates Applicant's priority date.

[67] Opposer states that, in addition to garnering "unsolicited media coverage," its PCS saws have "received many awards." Opposer's Main Brief, 74 TTABVUE 17. These include "the 'Top Tool' award in 2018" and "the 'Top-Rated Table Saw' award in 2020," both from Wood Magazine, and "the best overall cabinet table saw" in a 2023 article from BobVila.com. *Id.* "Opposer's PCS Saws were also listed on Popular Mechanics' Best Table Saws list of 2022." *Id.* However, the only award that might have been bestowed prior to Applicant's constructive date of first use is the Top Tool award in 2018, though we cannot be sure because the exact date of the award is not specified in the record. In addition, only the article from BobVila.com was made of record, and, aside from the fact that the article is apparently from 2023, it also does not show PCS being used in connection with Opposer's saw. Applicant's First Notice of

Lastly, Opposer notes that it has "produced many examples demonstrating that consumers refer to Opposer's PCS Saws by Opposer's Mark."[68] These examples include chat transcripts between Opposer's customer service representatives and visitors to Opposer's website, as well as screenshots from online woodworking discussion forums.[69] For instance:

- In one of the chat transcripts, a potential purchaser asks if there "is a big difference between the ICS mobile base and the PCS?" The customer service representative answers that there is a difference and notes that "You can pay extra and get the Industrial Mobile base for your Professional Saw, if you want the 4 caster wheels."[70]

- In another chat transcript, a potential purchaser asks, "how does the power of the 1.75hp motor compare to the 3.0 in the pcs." The customer service representative responds, "Well, the 3hp Professional Cabinet Saw will allow you to cut any type of material from softwoods to hardwoods without bogging the motor down."[71]

- In a third chat transcript, a customer states, "I own a SawStop ICS, [I'm] trying to figure out if the ICS fence will fit on a PCS." The customer

---

Reliance, 66 TTABVUE 31-44. Instead, it refers to Opposer's saw only as the "SawStop Professional Cabinet Saw," "the SawStop," or "the SawStop cabinet saw." *Id.* at 33. Therefore, we find this evidence does not support the conclusion that consumers have come to recognize PCS as a trademark for Opposer's saws. *See In re Franklin Cnty. Hist. Soc'y*, Ser. No. 77699113, 2012 TTAB LEXIS 326, at *24-25 (TTAB 2012) (noting that, while awards won by the applicant indicated that the applicant's services had achieved national recognition, the evidence did not establish acquired distinctiveness specific to the term the applicant sought to register).

[68] Opposer's Main Brief, 74 TTABVUE 18.

[69] *Id.*; *see* Opposer's Sixth Notice of Reliance, 72 TTABVUE 10-26, 57-92, 153-181, 182-190. We note that two of these examples, consisting of screenshots from the Sawmill Creek online forum and a message board on tigerdroppings.com, feature only messages posted after Applicant's constructive date of first use. 72 TTABVUE 154-181, 183-190. Thus, this evidence has no bearing on our determination as to whether Opposer's alleged PCS mark acquired distinctiveness prior to Applicant's constructive use of its PCS mark.

[70] Opposer's Testimony Declaration (Howard), 38 TTABVUE 31.

[71] *Id.* at 35.

service representative explains that "the ICS fence won't fit properly on the PCS and vice versa."[72]

- A customer service representative suggests to a customer in a different chat transcript that, "[f]or a smaller footprint you can get our Professional Cabinet saw." The customer responds, "I wish I could afford the PCS."[73]

- A member of the Sawmill Creek online forum posts, "I'm wondering if a couple Sawstop PCS owners could get me a couple dimensions before I unbox my fence?" Another member responds, "I have the industrial mobile base on my PCS and absolutely love it."[74]

- A member of the Wood Talk Online forum created a post titled "First Table Saw: Bosch Reaxx or Sawstop PCS?," asking for opinions on which saw to buy. One forum member replies, "[I]f you can afford the Sawstop, buy it." Another forum member says, "You won't regret the SawStop, but even though the Bosch has a safety feature, you will regret the job site size in the long run."[75]

- In a Reddit post titled "SawStop Contractor vs PCS," a user requests "opinions (hopefully from people who have the two types of saw I'm looking at) on contractor vs. PCS."[76]

Like the unsolicited media coverage examples discussed above, these examples do not show that the involved relevant consumers (or potential consumers) view PCS as a trademark for Opposer's saws. When we consider these examples together with all of the other evidence of record, *see W. Fla. Seafood*, 31 F.3d at 1125-26, we find that, by and large, they show PCS being used by consumers to designate a particular model of SawStop saw (i.e., the professional cabinet saw) or otherwise to differentiate between Opposer's saw types (i.e., "ICS" vs. "PCS").

---

[72] *Id.* at 40.

[73] *Id.* at 44.

[74] Opposer's Sixth Notice of Reliance, 72 TTABVUE 11, 15.

[75] *Id.* at 18-19.

[76] *Id.* at 58.

In sum, while the evidence of record shows that Opposer has used the PCS designation in some fashion since at least 2008 and appears to have had some success in selling saws associated with the PCS designation and in garnering unsolicited media coverage of its saws, Opposer has not satisfied its burden to show that consumers of Opposer's saws came to view PCS as an identifier of source for the saws prior to Applicant's constructive date of first use.

### C. Finding as to Priority

Considering the record as a whole, we find that Opposer has failed to establish, by a preponderance of the evidence, use of its pleaded PCS designation as a distinctive source identifier (either inherently or through the acquisition of secondary meaning) prior to the constructive first use of Applicant's PCS mark.

### D. Likelihood of Confusion

Because Opposer has not established priority, the claim under Trademark Act Section 2(d) must fail, and we need not reach the issue of likelihood of confusion. *Exec. Coach Builders*, 2017 TTAB LEXIS 201, at *89 ("We need not reach the issue of likelihood of confusion because without proof of its priority, Opposer cannot prevail.").

## V. Lack of Bona Fide Intent

We turn now to Opposer's claim that Applicant lacked a bona fide intent to use the PCS mark in U.S. commerce for all of the goods identified in Applicant's application as of the application's filing date.

To reiterate, the application identifies Applicant's goods as follows:

> Stationary woodworking systems comprising circular saws, band saws, table saws, panel saws, electric sanders, spindle motors, shapers, drilling machines, and safety devices attended thereto; stationary sliding table saw

37

systems comprising band saws, table saws, panel saws, electric sanders, spindle motors, shapers, drilling machines, and safety devices attended thereto, all of the foregoing for use in woodworking and for cutting off finished plastics, in International Class 7.

As already noted, Applicant's application was not filed on an intent-to-use basis under Trademark Act Section 1(b), and is, in fact, a request for extension of protection to the United States, filed under Trademark Act Section 66(a), 15 U.S.C. § 1141f(a). Similar to Section 1(b), however, Section 66(a) requires that a request for extension of protection to the United States include "a declaration of bona fide intention to use the mark in commerce." Accordingly, the case law regarding lack of bona fide intent, which generally developed in the context of Section 1(b) applications, is also applicable to determinations of bona fide intent under Section 66(a). *See Nestle*, 2020 TTAB LEXIS 267, at *28.

"Whether an applicant has a bona fide intent to use a mark in commerce is an objective inquiry based on the totality of the circumstances." *Id.* at *39. And the circumstances must indicate that the applicant's intent to use the mark is "firm" and "demonstrable." *M.Z. Berger & Co. v. Swatch AG*, 787 F.3d 1368, 1375-76 (Fed. Cir. 2015); *see also Tequila Cuadra*, 2025 TTAB LEXIS 207, at *12 ("A determination of whether an applicant has a bona fide intention to use the mark in commerce is an objective determination based on all the circumstances." (quoting *Boston Red Sox Baseball Club Ltd. P'ship v. Sherman*, Opp. No. 91172268, 2008 TTAB LEXIS 67, at *16 (TTAB 2008))). The record "must reflect an intention to use the mark . . . 'in the ordinary course of trade . . . and not . . . merely to reserve a right in a mark.'"

*Commodore Elecs. Ltd. v. CBM K.K.*, Opp. No. 91086336, 1993 TTAB LEXIS 6, at \*12 n.7 (TTAB 1993) (quoting Trademark Act Section 45, 15 U.S.C. § 1127).

Opposer bears the burden of demonstrating by a preponderance of the evidence that Applicant lacked a bona fide intent to use the mark in U.S. commerce on the goods identified in the involved application when the application was filed. *See Tequila Cuadra*, 2025 TTAB LEXIS 207, at \*12-13; *Nestle*, 2020 TTAB LEXIS 267, at \*28-29. Opposer may satisfy this burden by showing, inter alia, an absence of any documentary evidence regarding such intent on Applicant's part. *See Nestle*, 2020 TTAB LEXIS 267, at \*29; *Rsch. in Motion Ltd. v. NBOR Corp.*, Opp. No. 91179284, 2009 TTAB LEXIS 673, at \*12 (TTAB 2009) (citing *Commodore Elecs.*, 1993 TTAB LEXIS 6, at \*13). If Opposer satisfies this initial burden of proof, the burden of production shifts to Applicant to offer additional evidence showing its bona fide intent to use its mark in U.S. commerce in connection with the identified goods. *Saul Zaentz Co. v. Bumb*, Opp. No. 91156452, 2010 TTAB LEXIS 236, at \*13 (TTAB 2010) (citing *Commodore Elecs.*, 1993 TTAB LEXIS 6, at \*13 n.11).

## A. Opposer's Arguments and Evidence

Opposer contends that Applicant "has admitted that it has never used, nor has any intent to use, Applicant's Claimed Mark in connection with 12 out of 16 of the different types of goods listed in the Application."[77] In support, Opposer points to the deposition testimony of Ruan du Toit, CEO of Applicant's wholly-owned U.S.

---

[77] Opposer's Main Brief, 74 TTABVUE 21; *see also id.* at 49-50.

subsidiary, ASW Machinery Corp. d/b/a Felder USA.[78] Specifically, when Opposer's counsel asked Mr. du Toit whether Felder USA sells "stationary woodworking systems comprising . . . band saws" under the PCS mark, he answered that it does not currently sell such goods under the mark and that he did not know of any plans to do so.[79] Mr. du Toit proceeded to testify similarly that Felder USA had not sold, and did not have any plans to sell, stationary woodworking systems comprising: panel saws,[80] "electronic sanders,"[81] spindle motors,[82] shapers,[83] or drilling machines.[84] He likewise testified that, as to the identified "stationary sliding table saw systems," Felder USA had not sold, and did not have any plans to sell, such systems comprising: band

---

[78] *Id.* Excerpts from Mr. du Toit's discovery deposition testimony were made of record in Opposer's First Notice of Reliance, 32 TTABVUE 8-49.

[79] Opposer's First Notice of Reliance, 32 TTABVUE 15-16. Mr. du Toit specifically indicated that any plans to sell band saws under the PCS mark would "be from Felder KG." *Id.* at 16.

[80] *Id.* at 19.

[81] *Id.* Applicant's request for extension of protection identifies "electric sanders," not "electronic sanders." Thus, this specific testimony establishes only that Applicant has not sold and had no plans to sell a particular type of stationary woodworking system comprising electric sanders (i.e., electric sanders that feature or include electronics). That said, Applicant has not offered any argument on this point or any evidence that it has sold or had plans to sell "electric sanders" other than those featuring or including electronics.

[82] *Id.*

[83] *Id.*

[84] *Id.* at 20.

saws,[85] panel saws,[86] electric sanders,[87] spindle motors,[88] shapers,[89] or drilling machines.[90]

Opposer further notes that, aside from this testimony, "Applicant also failed to produce any documents indicating that it made any efforts (e.g., market research, product testing, etc.) prior to or at the time of filing its [a]pplication to use or plan to use Applicant's Claimed PCS Mark with any of Applicant's Goods."[91]

### B. Applicant's Arguments and Evidence

Applicant offers little argument or evidence on this point, merely countering in a footnote in its brief that Applicant "is a large entity that has been producing woodworking systems and components since the 1950s," and therefore "clearly had the ability to manufacture its PCS woodworking systems as of December 13, 2018, and indeed did manufacture a PCS system a handful of months later."[92]

### C. Findings as to Bona Fide Intent

We find that, in view of Mr. du Toit's testimony and the general lack of documentary evidence evincing Applicant's intent to use the applied-for PCS mark as to most of the identified goods, Opposer has met its initial burden of demonstrating

---

[85] *Id.* at 21.

[86] *Id.*

[87] *Id.* Unlike Mr. du Toit's testimony regarding "electronic sanders" with respect to Applicant's stationary woodworking systems, here his testimony actually refers to "electric sanders."

[88] *Id.* at 22.

[89] *Id.*

[90] *Id.*

[91] Opposer's Main Brief, 74 TTABVUE 50.

[92] Applicant's Brief, 90 TTABVUE 14 n.5.

by a preponderance of the evidence that when Applicant's application was filed, Applicant lacked a bona fide intent to use the mark as to stationary woodworking systems comprising band saws, panel saws, electric sanders, spindle motors, shapers, and drilling machines, and as to stationary sliding table saw systems comprising band saws, panel saws, electric sanders, spindle motors, shapers, and drilling machines.

And we find that Applicant, in turn, has failed to meet its burden of production to come forward with "other facts which adequately explain or outweigh the failure . . . to have any documents supportive of or bearing upon its claimed intent to use its mark in commerce" as to the goods specified above. *Commodore Elecs.*, 1993 TTAB LEXIS 6, at *13; *see also Honda Motor Co. v. Winkelmann*, Opp. No. 91170552, 2009 TTAB LEXIS 202, at *5 (TTAB 2009) ("The Board has held . . . that the absence of any documentary evidence regarding an applicant's bona fide intention to use a mark in commerce is sufficient to prove that an applicant lacks such intention . . . unless other facts are presented which adequately explain or outweigh applicant's failure to provide such documentary evidence.").

We acknowledge that evidence of an applicant's ability and means to immediately manufacture the identified goods can, in certain circumstances, establish a bona fide intent where documentary evidence of such intent is otherwise lacking. *See, e.g.*, *Nestle*, 2020 TTAB LEXIS 267, at *41-42 ("[A]n applicant's capacity to market and manufacture the identified goods consistent with the natural extension of its current product line can rebut the lack of documentary evidence."); *Wet Seal, Inc. v. FD*

*Mgmt.*, Opp. No. 91157022, 2007 TTAB LEXIS 21, at *47 (TTAB 2007) (finding applicant's capacity to market and manufacture goods, having previously done so under different marks, rebutted claim of lack of bona fide intent). However, in this case, neither Applicant's ability to manufacture woodworking systems, nor the fact that it manufactured and offered for sale a woodworking system comprising a table saw, is sufficient to establish Applicant's bona fide intent with respect to the goods specified above, when the uncontroverted testimony of record plainly establishes that Applicant has never had any plans to manufacture or offer those goods in U.S. commerce under the PCS mark. *See M.Z. Berger*, 787 F.3d at 1373, 1378 (affirming the Board's finding of lack of bona fide intent where, inter alia, applicant had a history of making and selling watches generally but "never took any step toward developing any [watches with certain technological] features, either contemporaneous with the filing of the application or in the eighteen months thereafter"). Simply put, Applicant has not addressed Mr. du Toit's testimony or otherwise directed us to any documentary evidence that would counteract his testimony and establish an intent to offer under the PCS mark either stationary woodworking systems or stationary sliding table saw systems comprising band saws, panel saws, electric sanders, spindle motors, shapers, or drilling machines. We therefore find that Applicant lacked a bona fide intent to use its applied-for PCS mark on these goods in U.S. commerce when it filed its request for extension of protection of its international registration.

Opposer's reply brief suggests that, if we find that Applicant lacked a bona fide intent as to most of the identified goods, then the application, as a whole, should be

void.[93] However, "case law makes clear that if a lack of bona fide intent is found as to some but not all of the goods . . ., the former would be subject to deletion from the application, but absent proof of fraud, the application, or relevant class, would not be considered void in its entirety." *Monster Energy Co. v. Tom & Martha LLC*, Opp. No. 91250710, 2021 TTAB LEXIS 458, at *16 (TTAB 2021) (citing *Syndicat Des Proprietaires Viticulteurs De Chateauneuf-Du-Pape v. Pasquier DesVignes*, Opp. No. 91179408, 2013 TTAB LEXIS 308, at *50 (TTAB 2013)); *Wet Seal*, 2007 TTAB LEXIS 21, at *7 ("[A]n application will not be deemed void for lack of a bona fide intention to use absent proof of fraud, or proof of a lack of bona fide intention to use the mark on all of the goods identified in the application, not just some of them.").

With that in mind, we find that Opposer has not established, by a preponderance of the evidence, Applicant's lack of bona fide intent to use the PCS mark on "stationary woodworking systems" comprising "table saws" or "circular saws," and "safety devices appended thereto," or on "stationary sliding table saw systems" comprising "table saws" and "safety devices appended thereto."

We reach this finding because, in contrast to his testimony regarding the other identified goods, Mr. du Toit testified that Applicant's U.S. subsidiary has sold "sliding table saws,"[94] which are, self-evidently, a type of table saw. And in answers

---

[93] Opposer's Reply Brief, 91 TTABVUE 25 (arguing that "[r]egistration of Applicant's Claimed PCS Mark should also be refused because Applicant lacks a bona fide intent to use the PCS Mark in connection with the vast majority of the goods listed in its Application").

[94] Opposer's First Notice of Reliance, 32 TTABVUE 17 ("Correct. We have up to this point sold sliding table saws."); *see also id.* at 23 ("Q. Has anyone used Felder's PCS system on anything other than the table saw? A. Not that I am aware of.").

to interrogatories made of record by Opposer, Applicant stated that it "first exhibited its PCS Mark in the United States at the 2019 AWFS Fair trade show in Las Vegas, Nevada, from July 17-20, 2019";[95] "has sold systems comprising saws in the U.S. under the mark PCS";[96] and "has taken sales deposits on five Format 4 Kappa 550 stationary dimension saw woodworking systems incorporating the PCS technology."[97] In addition, on May 29, 2019, "Felder Group USA"[98] posted on its Facebook page a video of a person operating a table saw with the caption "Don't cut yourself – PCS system from Felder Group."[99] A commenter on the page asked whether the PCS system "will be available in the USA" and the Felder Group USA account replied that "it will go into production and be available in the USA next year."[100] The record also indicates that the orders for at least some of the PCS woodworking systems were placed in 2021.[101]

---

[95] Opposer's Fifth Notice of Reliance (Applicant's Answers to Opposer's First Set of Interrogatories), 71 TTABVUE 14.

[96] *Id.* at 17.

[97] *Id.* at 11. Opposer's Kappa 550 saw is a sliding table saw. *See* Opposer's Sixth Notice of Reliance, 72 TTABVUE 121 (excerpt from Applicant's website, displaying a photograph of the saw and referring to its "sliding table").

[98] In an answer to an interrogatory, Applicant indicated that "Felder Group USA" is the d/b/a of ASW Machinery Inc., which "is a wholly owned subsidiary of Felder KG." Opposer's Fourth Notice of Reliance, 35 TTABVUE 34. Elsewhere in the record Applicant refers to the d/b/a as "Felder USA." Applicant's Brief, 90 TTABVUE 14. We presume that both of these d/b/a names identify the same entity, as the record otherwise contains no indication to the contrary.

[99] Opposer's Third Notice of Reliance, 34 TTABVUE 17.

[100] *Id.* at 18.

[101] *See* Opposer's First Notice of Reliance, 32 TTABVUE 18 (du Toit Discovery Deposition) ("Q. And you produced some invoices, your counsel produced to us some invoices last night which showed various sales for which orders were placed during 2021, and the invoices were dated January 31. Is that consistent with your recollection? A. Sounds about right, yes."). *See*

"The bar for showing a bona fide intent is not high." *M.Z. Berger*, 787 F.3d at 1378. And actions taken by an applicant after the filing of an application can corroborate that the requisite bona fide intent existed at the time of filing. *See, e.g., Lane Ltd. v. Jackson Int'l Trading Co.*, Opp. No. 91092025, 1994 TTAB LEXIS 41, at *19 (TTAB 1994) (finding correspondence, which concerned a potential licensing agreement and occurred months after the filing of the application, corroborated applicant's bona fide intent to use the mark). Here, the record establishes that Applicant began marketing its PCS table saw systems shortly after filing its application, promoted its PCS mark at a trade show later that same year, began to take sales deposits for saws with PCS technology, and ultimately sold those saws to consumers in the U.S. This evidence corroborates that Applicant had the requisite bona fide intent, at least as to table saws, at the time Applicant filed its application. *See id.*

We note that Mr. du Toit's testimony does not address "circular saws" at all, nor does Opposer discuss "circular saws" in its arguments. However, the term "circular saw" is generally defined as "a power saw with a circular cutting blade" or "the blade itself."[102] And, based on the record, "table saws" are power saws featuring circular

---

*also* Opposer's Fourth Notice of Reliance (confidential), 36 TTABVUE 59-227 (relevant invoices).

[102] *See* MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/circular%20saw (accessed on May 6, 2025). The Board may take judicial notice of dictionary definitions, including online dictionaries that exist in printed form or regular fixed editions. *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imps. Co.*, Opp. No. 91061847, 1982 TTAB LEXIS 146, at *7 (TTAB 1982), *aff'd*, 703 F.2d 1372 (Fed. Cir. 1983).

cutting blades.[103] Thus, "table saws" could be considered a type of "circular saw." Accordingly, our finding of bona fide intent as to "table saws" also applies to the identified "stationary woodworking systems" comprising "circular saws." We also apply this finding to the identified "safety devices appended thereto," with respect to "table saws" and "circular saws," because the record indicates that the safety devices are essentially a component part of those goods.[104]

**Decision:** The opposition to registration of Applicant's PCS mark is:

(1) **dismissed** as to the claim of likelihood of confusion under Trademark Act Section 2(d);

(2) **sustained in part** as to the claim of lack of bona fide intent to use under Trademark Act Section 66(a), with respect to "Stationary woodworking systems comprising band saws, . . . panel saws, electric sanders, spindle motors, shapers, [and] drilling machines" and "stationary sliding table saw systems comprising band saws, panel saws, electric sanders, spindle motors, shapers, and drilling machines"; and

---

[103] *See, e.g.,* Applicant's Second Notice of Reliance, 67 TTABVUE 349 (page from owner's manual for the SawStop 10″ professional cabinet saw, showing that the saw features a circular blade); Opposer's Sixth Notice of Reliance, 72 TTABVUE 118-123 (excerpts from Applicant's website, showing that Applicant's sliding table saws feature a circular saw blade). In addition, the record contains invoices for Opposer's saw systems with invoice dates in 2021 and 2022. Opposer's Fourth Notice of Reliance (confidential), 36 TTABVUE 103-301. These invoices refer to Opposer's "Preventive Contact System – PCS" and list a "circular saw table extension" as a component of the saw system being sold. *Id.*

[104] Mr. du Toit testified that "[a]ll various forms of equipment have various forms of safety devices connected to them depending on the tool or the functionality of the tool" and that such safety devices are not sold separately under the PCS mark. Opposer's First Notice of Reliance, 32 TTABVUE 20, 22.

(3) **dismissed in part** as to the claim of lack of bona fide intent to use the mark in commerce under Trademark Act Section 66(a), with respect to "Stationary woodworking systems comprising circular saws . . . [and] table saws, . . . and safety devices attended thereto" and "stationary sliding table saw systems comprising . . . table saws . . . and safety devices attended thereto, all of the foregoing for use in woodworking and for cutting off finished plastics."[105]

---

[105] Following close of the appeal period, the identification of goods in Applicant's application will be amended to delete those goods for which the opposition based on a lack of bona fide intent has been sustained. The application may then proceed in due course to registration with the following amended identification of goods: "Stationary woodworking systems comprising circular saws and table saws, and safety devices attended thereto; stationary sliding table saw systems comprising table saws and safety devices attended thereto, all of the foregoing for use in woodworking and for cutting off finished plastics," in International Class 7.